DANULA *v.* QUINCY MINING CO.

1. MASTER AND SERVANT—SAFE PLACE—NEGLIGENCE—TIMBERING.
 A mining company is liable for injuries to an employé engaged in timbering a level of a mine, under an overhanging and unsupported rock wall, which fell upon him, which he was assured by his boss and supposed was safe, and which was situated in a stope leading from a portion of the mine that had been prepared as a level for operations, by widening, laying track and inspecting the work.

2. SAME—ASSUMPTION OF RISK—FELLOW-SERVANT—MINING OPER-
ATIONS.
> The plaintiff did not assume the risk of the danger or of the
> negligence of his superior in failing to place proper supports
> to render the place safe.

Error to Houghton; Streeter, J.  Submitted January
13, 1911.  (Docket No. 83.)  Decided March 31, 1911.
Rehearing denied September 29, 1911.

Case by Henry Danula against the Quincy Mining
Company for personal injuries.  Judgment for plaintiff.
Defendant brings error.  Affirmed.

*Hanchette & Lawton*, for appellant.

*O'Brien & Le Grendre*, for appellee.

MOORE, J.  The plaintiff, a timberman, recovered a
judgment for damages for injuries to his right arm caused
by the falling of rock while cutting a hitch in which a
timber called a "stull" was to be placed.  The accident
happened in a stope which led out of the thirty-ninth level
at the foot of shaft No. 7 in the mine of defendant.  The
level had been opened some distance past the stope and
had in it two rails upon which the cars ran which were
used for carrying out the ore and waste.  The plat will
aid in understanding the situation.  The dotted lines rep-
resent where the stull was to be placed.  The plaintiff
was cutting the hitch in the foot wall into which the
lower end of the timber was to be placed.  The case was
tried before a jury.  From a verdict in favor of the plain-
tiff, the defendant has brought the case here, claiming a
verdict should have been directed in its favor.

The trial judge submitted the case only upon one the-
ory, which is stated in his charge as follows:

"Now, as I have stated, the duty of the employer, or
the master, as it is called in the books, the duty of the
employer is to furnish a safe place for his employés
to work.  No employer is the insurer of absolute safety

of the employés. The place is to be considered with reference to the nature of the employment. Mining is usually recognized as a dangerous business, and the thing to be considered is whether a reasonably safe place in the mine has been furnished, and not whether it would be a safe place in a building, because the nature of the employment

determines the fact of whether a place is reasonably safe or otherwise. Men engage in all sorts of occupations. Some of them are very safe, so far as risk of injury or loss of life is concerned, and some are extremely dangerous. If a man works in a nitroglycerine plant, all that he can require is that the nitroglycerine plant be conducted in the usual, proper way in which such a plant is conducted. If he works in a powder mill, the same rule

applies there, * * * with regard to the nature of the occupation and the dangers which are incident to that employment.

"Now, the defendant company in this case must act through its agents. The duty of providing a safe place is one that rests upon the company, but the place must be made safe by certain of its employés, and it makes no difference by what title you call the employés at all, if that particular duty rests upon them. The claim of the plaintiff in this case, and one which he must establish by a fair preponderance of the testimony, is that the duty of making this particular place, where the accident occurred, safe, rested upon the timber boss. Now, it appears here that the timber gang consisted of six men besides the one who is called the boss, seven in all. The nature of their employment is in itself to increase the safety of the mine. That is their business, and, when they get through, the place ought to be much safer than it was when they began their work, so far as the other men employed in the mine are concerned.

"The first question for you to determine in this case will be whether the duty of inspecting the wall, taking down the rock, rested upon the foreman of the gang alone, or whether it was a duty which belonged to the members of that timber gang. Now, if the plaintiff has established by a fair preponderance of the testimony that the duty imposed by the mine, by the company, was upon the timber boss alone, you will have certain questions to consider that you will not have to consider if the duty imposed by the mine was on the timber gang, and not upon the boss. There can be no question that the duty rested somewhere, either upon the gang or upon the boss, at the time that they began to work at that place. If the plaintiff has failed to convince you by a fair preponderance of the testimony that the mining company had imposed this duty upon the timber boss alone, you will consider no other phase of the case, but bring in a verdict in favor of the defendant company. Now, what the men themselves did as members of the timber gang would not determine this question, because the men themselves might be perfectly satisfied to rest upon the judgment and added experience of the timber boss and so act. But the mining company itself had not imposed that duty upon the timber boss alone, but had left it generally to the timber gang;

166 Mich.—23.

the custom of the gang itself would have no influence in the matter, because that is a matter that they might arrange among themselves, to suit themselves. If you shall have found, though, as I said, the duty rested upon the timber boss alone, then you will consider whether he performed that duty. The testimony in this case on that point is conflicting. If, when they went into that place where the accident occured, no examination was made by the boss, and nothing was done, you would be justified in finding that that was an act of negligence for which the defendant company is liable, providing, of course, as I said, that you have determined that it was the duty of the boss alone to make that examination. But if you determine from the evidence that there was an examination made, and that rock was pinched down, * * * the defendant company would not be liable, because if the one on whom this duty rested was a competent man, and in his judgment he had performed the duty, the company would not be liable for an error in his judgment which caused the injury.

"This is another phase of the case which you ought to consider. The plaintiff in this case was a man who had had the experience which has been shown to you, in work underground in different capacities, in two mines. If you find from the testimony that he had heard somebody say that there is loose rock here, or this is dangerous ground, or something of that kind that called his attention to the matter, it will be for you to determine whether a reasonably prudent man, with experience which he has had under ground, would make an observation for himself before he went to work; and if you should be of opinion that a reasonably prudent man would look for himself to ascertain whether this warning was one called for or not, and you find from the testimony that he did not so look, he is not entitled to recover in this action."

It is the claim of defendant that, under the facts disclosed by the record, the doctrine of safe place does not apply, that the timber boss was a fellow-servant, and the plaintiff assumed the risk. These propositions may be considered together.

Plaintiff's version of the accident is as follows: After stating that he told the timber boss when he was hired

that he had been a trammer, and not a timberman, he proceeded as follows:

"Paul Kemppainen worked with his gang in No. 7 shaft. The timber boss I spoke to in regard to not having done any timbering before was Paul Kemppainen. I worked under Paul Kemppainen right along, was working for him on the day of my injuries. I was holding a moil, worked generally there from August to April putting up timber. Paul said these timbers were to be put up for the purpose of preventing the rock and stone rolling down to the track. I was moiling the hitch in the rock and putting up the timber and sawing them. We ourselves used to take the timbers out from the shaft to wherever we wanted to put them. The boss used to order us what to do, I mean the one that was boss over us, Paul Kemppainen. In our gang were six men working, and the boss, seven. Paul used to examine the place where we worked to see whether it was safe. I never did it because the boss was an old man and we would depend upon him. It was after 8 o'clock, going on 9 o'clock in the morning, when this injury happened, when I injured my hand. Seven o'clock they began to lower the men down in the mine. After we were lowered down in the mine, we started to work there in the drift, 390 foot level, south side of the shaft. I don't know positively how far from the shaft, but I think that it was somewhere around a thousand feet. It may be a little less or a little more. I can't describe it for the reason that was the first time I went in there; but it was quite a large opening, and there was a car track there.

"*Q.* How was the drift as to being finished?

"*Mr. Lawton:* I object to the question. He doesn't know whether it was finished or going, or how.

"*A.* That I don't know, but there were some miners there. This was a drift. The boss took us over to work at that place. We were told to moil the hitch, cutting the hitch, for putting up the timber. A 'moil' is a piece of steel. One end is sharp, and which is held against the rock for the purpose to cut a hole in the rock to put the end of the stull timber for putting it up, and we call such a hole that we cut with a moil a 'hitch.' Before I went to work there, before I went to work to hold the moil, I heard some talk between Mr. Kemppainen and some of the other men in the gang. One man told the boss: 'Let us

sound this rock or pinch it down, or else let's put up the timber so as to make a safe place to work.' The boss says, ' No.' He says: ' Start to work. The place is all right. There is no danger at all.' After he said that, I start to moil the hitch. I relied upon the boss when I started to moil that hitch. I went to work cutting the hitch with the moil, and the rock fell down and I broke my arm, the right arm.     *     *     *

"*Q.* Now, before that rock fell down, did you know that the hanging wall was in a dangerous condition?

"*Mr. Lawton:* I object to that question as calling for a conclusion.

" *The Court:* Take an answer.

"*Mr. Lawton:* Exception.

"*A.* No.

"*Q.* Now, Henry, were you able at that time to judge whether the hanging wall was safe or not?

" *Mr. Lawton:* I object to that as calling for a conclusion of the witness. He has stated his experience and stated what he did.

" *The Court:* Take an answer.

" *Mr. Lawton:* Exception.

"*A.* No, I didn't examine the hanging wall at all. The boss says the place is safe, start to work, and I depend upon him."

The balance of the testimony we quote may be stated to be the most favorable for the plaintiff of any given:

" The stulls will be put up here, the boss said that. I don't remember positively if the boss looked at the hanging wall, but he always examined. Some one said something about the hanging wall, what condition it was in, but I don't remember who it was, about the loose rock, as there appeared to be some loose rock. Of course some of it was taken down. The man asked if this place was all right to work and he answered it was; the boss said so. As we were down there pinching down some rock, and it appeared to be all right then, and we worked a little while, and another crash we heard, and we all went away from there. Then, just as we run away from there, some small rock and the dust came down, and it appeared a loose rock then, and we were trying to pinch that down, but we couldn't get it down, so some one says that we either have to pinch that down or put up a prop to keep it up. When that was said, the boss says that

is all right, and we were compelled to go to work.  He told us to go to work.

"*Q.* And, when you were working there, the boss would be the one who would judge of the safety of the hanging wall, would he?

"*A.* Yes.

"*Q.* And, if he told you men it was safe and to go to work, you were supposed to go to work, were you?

"*Mr. Lawton:* I object to that as calling for a conclusion of the witness as to what he had to do in that regard.

"*The Court:* I think the question is immaterial.  A man is supposed to work when the boss tells him.  The witness can answer it.

"*A.* Yes, after the boss told us to go to work, I started moiling a hitch.  *  *  *"

Redirect examination by Mr. O'Brien:

"That piece of rock that fell couldn't have been taken down without the boss would order it done; the boss didn't let us men pinch that piece of rock down; he told us it was safe.  We men then went to work relying upon his superior knowledge and experience.

"*Q.* And that was the custom in that mine there, was it?

"*Mr. Lawton:* I object to what the custom was.

"*Mr. O'Brien:* I think that's admissible to show the custom of the work.

"*The Court:* Take the answer.

"*A.* Yes; that is, it was the custom for us to rely upon the boss' directions in regard to unsafe hanging and in regard to pinching down the loose rock before we went to work."

Recross-examination by Mr. Lawton:

"I don't know if the boss sometimes makes mistakes.  He uses his best judgment, and everybody that works in a mine uses his best judgment."

On the cross-examination of one of the mining captains, he testified, in part:

"Paul Kemppainen was the timber boss in No. 7 shaft.  In that gang there were six men and him.  Those men were expected to obey him to a certain extent.  They were put in his charge in doing the work, so that they were expected to obey him while on the job, to a certain extent,

of course.   The duty in the first place to look over the place
to see whether there was any loose piece was in the party
and to the men.   It was his duty as boss to first look it
over and then order the men to take it down if he was in
there.   They use their own judgment.   If they didn't
think it was safe, they didn't need to go.   The timber
boss generally goes because he can talk English.   We
don't put a man as timber boss unless he has experience.
He got to do decent work, and the timbering up of a shaft
is work that can't be done unless a man has experience.
Mr. Kemppainen had considerable experience.   He worked
there two or three years.   He had more experience than
some men under him.   I suppose he did have a good deal
more experience than Mr. Danula, the plaintiff, as far as
timbering goes."

The shift boss was sworn as a witness for defendant,
and testified in part as follows:

" The duties of a timber boss is to take his gang and
order them to do the work that's laid out to them; see
that they do the work and keep at it; measure timber and
have it cut to the right length that he wants to put in.
He is with the men all the time and takes a hand in when
his help is needed."

Cross-examination by Mr. O'Brien:

"The timber boss is supposed in the first place to look
over the situation where he is going to put in timber.
He is supposed to do that for the protection of his men,
and the men have a right to do it also.   The company
merely lay out the work for the timber boss.   He is the
man who is supposed to do the work, and he is the man
who has the responsibility, if he orders the men to go to
work, providing it is safe, if they leave it to his judgment.
Generally they are supposed to obey orders.   Usually
with a company, a large corporation, the duties of the cor-
poration is that the men should obey orders; that's true.
The timber boss has charge over the timber operations in
that shaft where he is working.   He is not all the time a
man who has greater experience in regard to judgment,
judging loose ground, than men who work under him.
Sometimes there are men with us who have just as good
judgment as he has, as a rule; but sometimes they get
timbermen that has more experience.   Usually the timber
boss has greater experience.   I suppose men are promoted

on account of merit to an extent. Usually their experience counts when it comes to promoting men to the head of the gang. The timber boss can't discharge a man from his gang, not personally himself. He can report to the office and it is investigated. His report is upheld if it is all right, as a rule, unless the other man has got a very good cause. * * * We take this timber gang, and they have six men in the gang. They come into a place. The timber boss tells what to do. They are supposed to obey orders. If they have trammed down a certain amount of ground, and he says it is safe, go ahead and cut your hitch, they are supposed to cut hitches; that's the custom."

Redirect examination by Mr. Lawton:

"The timber boss has no authority at all to make any member of his gang work under a piece of loose ground. Every one of the gang has a right to take their bars and bar down a piece of loose ground that they see, or to throw a prop against it."

Recross-examination by Mr. O'Brien:

"If they suggest that a piece of ground should be barred or a prop put up, they are supposed to put it in themselves if they want to. If they suggest it and he says go ahead and work, if they are foolish enough to take his orders, all right. If I thought it wasn't safe over my head, I wouldn't obey no man. As to his limited knowledge and can't talk English, I can't tell about that. If he works under the timber boss' orders, all right; he is supposed to obey the orders of the timber boss. The very word 'boss' implies that he is to obey. They usually obey the man, if there is a question as to whether ground would stay up or not without a prop or whether it would stay up—whether it is unsafe, I don't know whether he is supposed to decide any more than the others. He is supposed to decide for that gang, if they take that as final, they have a right to take their own judgment under their employment, if they got judgment to do it. The timber boss is the one that leads them."

The chief mining captain testified, in part:

"The duties of a timber boss are to go to secure places that is required to be secured, by taking down, if it is necessary, loose ground, or putting in timbers as required, to

make the place secure and safe, whatever may be required, such as stulls or shaft timber or anything like that as regards timber. He has with him sometimes more men than others. Usually the timber boss has six men along with him. * * * There are no orders given in reference to working under loose ground. The general understanding throughout the mine is, the men working under ground, they are to look out for themselves, not to work under loose ground. If there is any loose ground, they are to take it down. It doesn't make any difference whether it is the timber boss or men working with the timber boss; they are all supposed to take it down. I have never seen it the duty of the timber boss to work his men under loose ground. He has no authority to discharge his men. It is supposed him and the men with him are to be satisfied in regard to it that the thing's all right. Generally it is the duty of each man in the gang. It is their duty, if they should see anything that was wrong, to report it, or otherwise go and secure it, or whatever there is to be done."

Cross-examination by Mr. O'Brien:

" The men would report it to the timber boss generally, and then the timber boss would give the orders what to do about it. If he, after looking it over, determined it was safe and told them to go to work, generally they would go to work; that is, usually they would have to defer to his judgment in that matter. That is not exactly expected of them by the company. He is liable to make a mistake in his judgment as well as the workmen in any fact. The workman is probably ordinarily supposed to defer to his superior. If he called the attention of the timber boss to a piece of rock that is loose, and the timber boss, after looking at it, says go ahead and cut your hitch, they are supposed to obey and take his judgment on it. That's necessary in one sense; but then again the timber boss isn't infallible. He don't know everything. But he is put in the place of timber boss because he is a man of larger judgment and experience than the men under him. Men are promoted on account of their judgment and experience. We generally pick out good men for that class of work. And, when he is put in there, he has authority to tell the men what to do; but he might not order it right. He is supposed to do the ordering, and they are supposed to do the obeying. Of course, if he told one of them to

jump in the shaft, I don't know that they would have to obey it; but anything in the scope of that, as a piece of hanging wall that might or might not be loose, it would probably be his judgment that would be taken; but if I was a workman, and I supposed there was a piece of ground unsafe, and I reported to him, and he says he thought it was safe, why I should probably use his judgment; but I would be satisfied for myself because he was liable to make mistakes the same as I; but, in any event, the workmen are supposed to obey the orders of the superiors, so that the ordinary work can be carried out with reasonable promptness. He may be wrong, but discipline requires that they shall obey him."

It is the claim of defendant that the case is controlled by the cases of *Petaja* v. *Mining Co.*, 106 Mich. 463 (64 N. W. 335, 66 N. W. 951, 32 L. R. A. 435, 58 Am. St. Rep. 505), and *Karppinen* v. *Mining Co.*, 154 Mich. 528 (118 N. W. 1118); *Erickson* v. *Mining Co.*, 130 Mich. 476 (90 N. W. 291); *Quincy Mining Co.* v. *Kitts*, 42 Mich. 34 (3 N. W. 240).

The plaintiff insists the case is easily distinguishable from those cases. The argument is (we quote from the brief):

"Counsel seems to have the idea that the cleaning off of this hanging wall was done for the purpose of preparing it for a set of timber. The record does not support this claim. The only purpose of removing this rock from the hanging was to make the place where the timber gang was working reasonably safe. If there was any question about that, it was a question for the jury. It is evident that the timber boss did not believe that, for the purpose of timbering, it was necessary to remove the piece of rock that fell down, because this rock was directly and vertically above the place where the plaintiff was cutting the hitch; whereas, the head of the piece of timber would rest against the hanging, at a point somewhere below this place. * * * The case of *Petaja* v. *Mining Co.*, 106 Mich. 463 (64 N. W. 335, 66 N. W. 951, 32 L. R. A. 435, 58 Am. St. Rep. 505), is therefore not in point. There the place where the men were working 'was an incident of mining. It was the result of the common work of the miner and the trammer, both, whose labor combined to

make it.'   Here the place was already prepared by the miners.   The level had been completed.   It had been widened out, not merely up to the point where the timbermen were working, but way beyond.   The track was laid, and the timbermen were sent there to put in some timber which would hold the rock, which the miners would blast, in working up from the level in stoping out the ground. So that the timbermen came to a place that was already prepared.   As they would work under the hanging wall for some time, in cutting their hitches, and in putting in their timber, it was necessary, and was a reasonable precaution, to test and examine the wall, so that, while they were doing this very work of timbering, the place would be reasonably safe.   Now, as the timber boss, according to plaintiff's testimony, had the authority to determine what should be done with relation to making this place seasonably safe, he was for that very purpose a vice-principal.   In taking down this loose rock he was simply making the place of his men secure.   *   *   *

"We contend that the facts in the case at bar bring it squarely within the principle applied in *Andrews* v. *Mining Co.,* 114 Mich. 375 (72 N. W. 242), where it is held that:

"'A mining corporation is liable for the death of a miner killed by falling rock in the course of his employment as a "hitch cutter," where it put him at work in an excavation wherein the walls were unsupported by stull timbers, notwithstanding there was room for two or three sets of such supports as they are commonly placed, without informing him of the fact, which it well knew, but of which he was ignorant, that the walls of the excavation had been left unsupported since the preceding day, and that the character of the walls was such that those which appeared perfectly safe were liable, if left for that length of time without support, to break suddenly and fall.'

"We contend that the facts in that case were not as strong for the plaintiff as they are in the case at bar.   In the *Andrews Case* it was established by the evidence that:

"'Under the method adopted by the defendant company, these hitch cutters were required in all cases to examine all places where they might go to work, and see and satisfy themselves that such places were safe, before beginning their work, and they were frequently cautioned and warned as to this duty, and that they must never, under any circumstances, work under overhanging ground

without first examining it, and being satisfied that it was all right, and, if found dangerous, to make or have it made safe; and they were allowed to take all the time and have all the assistance necessary for that purpose, and they understood and knew that no one would go ahead of them for that purpose, but that that was one of their particular duties.'

"In the case at bar, however, while it is true, as we have indicated; that no one would go ahead of the timbermen, yet it is also true that the timber boss was required by the custom of the mine to use all reasonable endeavors, such as inspection and examination of the place, and the barring down of the loose ground before permitting his men to go to work. In the *Andrews Case* it was shown that Andrews and his partner tried that particular piece of ground that fell upon him, but could make no impression on it. They had been trying to get it down. In the case at bar, however, it is uncontradicted that the plaintiff did not examine his place of work, for the reason that he was not able to judge whether the hanging wall was safe or not. The boss said the place was safe, and ordered the plaintiff to start to work, and he depended upon the boss.

" 'Where a mining corporation contracting for the removal of ore reserves to itself such arrangements as are necessary for the protection of workmen, it is liable for such injuries as happen to employés of the contractors without the fault of the employés. *Lake Superior Iron Co.* v. *Erickson,* 39 Mich. 492 (33 Am. Rep. 423).

"The court says:

" 'They testified, and the jury must have believed them, that the company reserved the power of determining when and where dangerous rock in the wall should be removed, if requiring removal by blasting, and of locating the supporting pillars or placing timbers to prop the wall. Such timbering would be expensive, and is not provided for by the contracts which are confined to rock and ore blasting and removal. Either the mine must be unguarded, or else, on this state of facts, the company must guard it.' *Lake Superior Iron Co.* v. *Erickson, supra.*

"So, in the case at bar, the company, through its timber boss, determined to what extent loose rock would be removed from the hanging wall. The timber boss was placed in authority over the plaintiff. The plaintiff was required to defer to the judgment of the timber boss. It would be unfair now to say that the defendant is not liable

for the failure on the part of the timber boss to discharge this particular duty of taking the necessary precautions to make the place safe."

The evidence discloses that the stulls were put in, not for the purpose of sustaining the hanging wall, but for the purpose of putting back of the stulls lagging which should sustain the ore as it was broken down in the stope until the ore should be loaded in the cars which were run over the rails shown in the blueprint.

In the brief of counsel for defendant it is said:

"The place where the plaintiff was injured was one of the safest in defendant's mine, being solid rock above from there to surface."

The record discloses that both hanging wall and foot wall were of solid rock, and that the stoping was done to remove all of the vein between these walls.

We think the case distinguishable from the cases cited by defendant, and that it is within the cases cited by the plaintiff, a line of cases represented by *Johnson* v. *Spear*, 76 Mich. 139 (42 N. W. 1092, 15 Am. St. Rep. 298); *Van Dusen* v. *Letellier*, 78 Mich. 492 (44 N. W. 572); *Brown* v. *Gilchrist*, 80 Mich. 56 (45 N. W. 82, 20 Am. St. Rep. 496); *McDonald* v. *Railroad Co.*, 132 Mich. 377 (93 N. W. 1041, 102 Am. St. Rep. 426); *Charron* v. *Carbide Co.*, 151 Mich. 687 (115 N. W. 718); and *Rowden* v. *Mining Co.*, 136 Mo. App. 376 (117 S. W. 695).

We also think the testimony which we have quoted justified the charge as given by the circuit judge.

Judgment is affirmed.

McAlvay, Brooke, Blair, and Stone, JJ., concurred.