JUNTUNEN v. QUINCY MINING CO.

1. MASTER AND SERVANT — MINES AND MINING—NEGLIGENCE—PER-
SONAL INJURIES—SAFE PLACE.

Where an employee of defendant mining company was
engaged in working in the mine as a member of the
repair crew and after one of the shafts had been crushed
in and needed repairs the crew, including plaintiff, at-
tempted to bar down the rock and a large quantity of
rock fell into and through the shaft, striking the plain-
tiff, the danger was incident to his line of employment
and plaintiff was not entitled to recover for his injuries:

as a part of the crew who were engaged in making safe the place which was obviously not safe at the time he was working in it, plaintiff assumed the risk.[1]

2. SAME—FELLOW-SERVANTS.

Members of the repair crew working with plaintiff and making the shaft safe were not vice principals but fellow-servants, and defendant was not chargeable with their negligence, in failing to protect him against the fall of material, by supporting the wall and roof of the level with timbers.[2]

3. SAME—PROMISE TO REPAIR—ASSUMPTION OF RISK.

Although it is plaintiff's claim that his superior servant or shift boss had assured him that the place in which he was working immediately below the forty-seventh level of the mine, where the crew were timbering, was safe and the timbering would be done so as to remove the alleged defect or danger in the level on the following day, and plaintiff remained at work in reliance upon this promise, *held*, that he assumed the risk of his injury because the danger was incident to his employment and it was obvious that the place was in a dangerous condition.

Error to Houghton; O'Brien, J. Submitted November 16, 1914. (Docket No. 54.) Decided March 17, 1915.

Case by Emil Juntunen against the Quincy Mining Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed, new trial denied.

*Hanchette & Lawton*, for appellant.

*Le Gendre & Driscoll*, for appellee.

BROOKE, C. J. The plaintiff, a native of Finland, was injured in defendant's mines through the fall of a piece of rock. The injury sustained was a broken

[1] Upon the servant's assumption of risk from changing condition of excavations in a mine during the progress of the work, see note in 19 L. R. A. (N. S.) 352.

[2] As to whether servants in a mine are fellow-servants, see note in 50 L. R. A. 437, 461.

leg. Plaintiff had resided in this country about 11 years and had worked for the defendant in various capacities practically all the time. For more than a year and a half prior to his injury he had worked in a repair crew in charge of one Savinini. The record discloses that shaft No. 2 had for a very considerable distance been crushed in and rendered useless. It became the duty of the repair crew, of which plaintiff was a member, to take out the old timbers of the shaft and the rock which had fallen and pressed in upon the shaft and to replace the old timber by new ones. At the time of the accident this work had progressed from the forty-first down to and perhaps a short distance below the forty-seventh level. After the happening of the accident to the plaintiff he was laid up for a period; and, as soon as the broken leg was healed, resumed his work with the defendant company, and continued therein for a period of two years and a half before he brought his suit. The accident happened on January 29, 1910, at which time the declaration charges that the plaintiff was at work in the shaft at a point on the ladder road in said shaft about 20 feet below said forty-seventh level (when) "a large and dangerous quantity of rock or ground fell, rolled, and descended, to wit, out of said forty-seventh level near said shaft and into and through said shaft and to, against, and upon the plaintiff and struck him with great force and violence," causing the injuries to plaintiff of which complaint is made. The declaration charges the defendant with negligence in not providing plaintiff with a safe place to work, and that it

"negligently allowed, permitted suffered, and caused said aforementioned work of taking out and putting in said timbers to be carried on and continued under and by a method and system under which reasonable provision was not made to protect plaintiff from injury from falling, rolling, and descending rock while engaged in and about the performance of

his duties and going to and from his said working place, and failed and omitted to adopt, use, and employ any reasonably safe, suitable, and proper method and system of doing said work; and it wrongfully, carelessly, and negligently failed and omitted to timber up and secure divers places in said shaft and mine from which rock and ground might and could fall to plaintiff's injury including, to wit, the sides of said shaft and portions of said forty-seventh level near said shaft; and it negligently allowed, permitted, and suffered each and all such places to be and remain untimbered and unsecured; and it wrongfully, carelessly, and negligently failed and omitted to properly or sufficiently inspect and examine such last-mentioned places and was negligently uninformed as to the safety and condition of such last-mentioned places on and before the day of the occurrence of said injuries; and it wrongfully, carelessly, and negligently failed and omitted to bar down and remove or prop up and secure, and allowed, permitted, and suffered to remain at such a place and condition as to be liable to at any time cause or occasion plaintiff's injury."

In the work of repairing it was necessary not only to replace the timbers in the shaft itself after taking away the fallen rock, but to secure the mouths of the crosscuts at the various levels. On the day in question, a part of the crew, having removed the rock during the shift at the forty-seventh level, had prepared to erect a "set" of timbers in the crosscut at the forty-seventh level about 10 feet from the shaft. Uprights had been erected and the timber to be used as a "cap" lay upon the level. This timber, which was 15 feet long, had to be cut to 13 feet in order to fit. When the work had reached this stage, the shift boss directed the men to stand back. The order seems to have been generally obeyed by the workmen at that point, though plaintiff claims that he heard no such order. Plaintiff up to the noon hour had been working at a point about 20 feet below the forty-seventh level. He describes the accident as follows:

"At the time I was hurt, I came up from the place where I was working and was picking up tools. My duties was taking old sets away all day, out from the shaft. I am not quite sure how many men were working with me, but I think there were about nine that day. My boss was Fred Pascoe and Charley Karpinnen. Pascoe's position was to have the work done and look after it. His job was called shift boss. Karpinnen was the timber boss. They both had a right to order me what to do. I had to do what they told me. We knew what work to do when Fred Pascoe, or either of them, told us. I was receiving $54 at that time for 26 shifts. Before I was hurt my health was good. I remember what day of the week it was that I was hurt. It was Saturday. I was day shift that week. They were working three shifts in the shaft there at that work I was at; three eight-hour shifts each day. I was at the forty-seventh level at the time I was hurt. I can't say exactly what time of the day it was when I was hurt, but it was near 3 in the afternoon. At the time I was hurt, I had a pick in my hand and some rail spikes. I was about to put them down on the other side of the shaft. Then we were to go up, go home. We were through work at that time. Our shift ended at 3 o'clock in the afternoon. The next shift just came down. As soon as we would go up they would take our places. We would get down to the forty-seventh level, up and down to our work in the skip, excepting the day shift when there was a truck. The truck ran right through the shaft and carried the men up and down. That is the way the men always went to and from their work. We went from that very level on this skip when we went up. It was dark down there in the mine. The men had sunshine lamps, little lamps they carry in their hats. Except for those lamps there was no light in the shaft. When I was hurt, I was at one of the usual places where the men would go after the end of the shift from that level.

"A stone fell down and struck me on the right leg. Both bones were broken. The stone fell from the mouth of the crosscut from the side, with reference to the forty-seventh level from the first corner where the crosscut goes. The crosscut runs out from the shaft; it goes straight north there. The shaft in-

clines. While we were working there, the captain and timber boss were with us. Sometimes they were a little further away. The timber boss was working with us. The shift boss didn't do anything. He was just looking on superintending the work. The shift boss would tell us how the work was to be done. The shift boss and timber boss were there on the Saturday that I got hurt. I heard several times that we would leave the place where this rock fell from for extra work, we would not bother with that now. I heard both the timber boss and shift boss talking about this place. They said it was all right for today; we would fix that another time. I suppose they examined the place, and, as they were in a hurry with the shaft, they left it for Sunday to be fixed up. * * * It was talked of Saturday, to the captain and timber boss. They said it was good at this time, and it would be fixed tomorrow. That meant the Sunday following that day I was hurt, next day. They talked of the very place from which the stone came, the stone which fell and hurt me. They told me to go to work under it, down the shaft. I relied upon their statements when they said the place was all right and would be fixed. I went to work and stood down there because I relied on it. That wasn't my duty to inspect such places as that. It was the duty of the captain and timber boss. * * *

"Q. And would you have continued to work down there if they had not made those remarks that the place was all right and they would fix it up on Sunday? * * *

"A. No, certainly I wouldn't have altogether done it if they hadn't said so. * * *

"Q. Where were you with reference to the place from which the rock which hurt you fell?

"A. I was right opposite the level in the shaft.

"Q. And when you were there, where was the place from which the rock fell, with reference to you?

"A. It was up, higher up from where I was.

"Q. Where did you come from when you came to that place where you were when you were hurt?

"A. I came from lower in the shaft.

"Q. How far down from that place was the place where you had been working?

"A. At least 20 feet, but I couldn't say exactly."

On cross-examination he gave the following testimony:

"I worked for a long time under Savinini in the repair gang before this accident, longer than a year and a half. When I worked in that gang, we did different kinds of work. We opened up old levels, took up tracks. In a way, we did some timberman's work, but very little. From Savinini's gang I went into the shaft in the timber gang, in November, 1909. From this time on till this accident happened, I was repairing this No. 2 shaft. We had to retimber that shaft for a long distance. We would have to remove loose rock. We retimbered the place up where this rock came out of. The shaft wouldn't have stayed open at all. We had to put sets of timbers to keep the shaft open so the skips could run. In many places we repaired the levels for a little ways close to the shaft, so that the trammers could go out on the levels and bring the rock out and dump it in the skips. On this forty-seventh level, from there down, there was no mining being done, no hoisting of rock in that shaft at that time. There were some miners working lower down than that at that time, too; but they, I presume, were bringing the other shaft up. They weren't working or going up and down this No. 2 shaft at that time, not lower than that. There couldn't any miners or trammers work in that shaft, because it was closed. I was one of the men that was working there, and had been there for some time to retimber this shaft and those levels close to the shaft so that work could start up again. I was at that time what was known in the mines as a 'timberman' or a 'shaft timberman.' Up to the time of this accident to me, we had timbered and done work in that shaft from the forty-first level down to the forty-seventh level. We left a little of the old timbers in the shaft; mostly new timbers were put in. In putting in new timbers, some sleepers were put in the bottom, clear across the shaft, about every five feet; the distances weren't all alike. I never measured how long these timbers were. The caps would be about 16 feet long. A cap is a square timber put on top of some other timbers to hold up the loose or bad hanging. We cannot put up caps until you put up the side timbers or legs or posts first.

In timbering a shaft there are long distances that we didn't place the sleepers in first on the foot wall at all. We put the sleepers about five feet apart. Then we put the runners to put the rails on. The sleepers and runners are about a foot square. Beside of each sleeper we put a post or timber going up to the hanging to hold the caps. That makes two skip roads in the shaft. Outside of the skip road and outside of these posts to go up, we build a ladder road. At No. 2 shaft the ladder road was on the north side.

"*Q.* Now at the levels, these different levels that you fix, you put in a platform, or platforms, of wood and timbers?

"*A.* On the levels?

"*Q.* At the different levels there is a platform, or a plat as we call them, of wood and timbers, all round, so that people can stand on those without falling down the shaft?

"*A.* Yes.

"*Q.* And then, if the levels are broken in and need posts and caps, you put those in there, near the shafts?

"*A.* Yes.

"*Q.* Now, before you worked in this timber gang, you had worked, you say, for a couple of years in the repair gang with Savinini?

"*A.* Yes.

"*Q.* And the duties of that gang was to go where there was any bad places that needed caps or timbers, to fix it, make it safe?

"*Mr. Driscoll:* Objected to as immaterial. I don't see what the purpose is. I don't see the materiality.

"*The Court:* Take the answer.

"*A.* Yes.

"*Q.* That is, to make places safe so that the workmen won't get hurt; no rock would fall on them.

"*Mr. Driscoll:* May I have an exception?

"*The Court:* You have an exception to every adverse ruling.

"*Mr. Driscoll:* We have a general objection to this line of questioning.

"*The Court:* Make your objection, but the exception follows. You have an objection to all this line of examination on the ground it is immaterial, and an exception follows.

"*A.* Yes, that is the kind of work we did."

At the conclusion of plaintiff's proofs, a motion was made to direct a verdict for the defendant upon the following grounds:

"I wish to move the court, under the record as made on the declaration, that the court direct a verdict for the defendant on the ground that the plaintiff has failed to establish a case of negligence against the defendant. In the first place, it appears that the plaintiff was a timberman and a member of a gang of men to repair shafts in places that needed repair, and to make a safe place for other workmen. That the furnishing of a safe place, in order to be furnished, must be done by work such as this work as this plaintiff was hired to perform, and that the company is not required to furnish him with a safe place, or there is nothing to show that he was furnished any other or different place than where he ordinarily would be sent to repair. So that the dangers that he had to encounter would be the ordinary dangers that grew out of the employment of a timberman. And it also appears from the testimony these dangers were known there and were appreciated by the men; that the liability of being injured by a rock was apparent to all, and that the accident, as far as the record now appears, although there is some conflict in it, is an accident pure and simple that might happen under like circumstances at any time, and under this testimony the plaintiff ought to be held, it seems to me, to assume the risk of the danger that was there.

"There is another ground. That the court should find as a matter of law there is a complete variance between the declaration and the proofs. This man wasn't injured while he was at his working place, as he claims, down 20 feet to 50 feet below that level, and that the assurances, or whatever is claimed in that regard, of protection and safety at that place where he was at work, he was not hurt there."

"*The Court:* As I see the case now, I think it is a case for the jury. Therefore the motion will be denied, and Mr. Lawton has an exception."

The court charged the jury, in part, as follows:

"If it was part of the duty of the shift boss to look after the safety of the places where the plaintiff was

required, expected, and permitted by defendant to work, pass, and be while engaged in and about the performance of his duties and going to and from his work and working place and to warn him of any dangers which existed in such places, and if the shift boss ordered the plaintiff to work, pass, and be in any such place without warning him of the existence of any danger therein, or if the shift boss saw plaintiff in any such place while plaintiff was engaged in and about the performance of his duties or going to or from his work or working place and did not warn him of any danger there or order him out of the place, that would amount in law to an implied assurance on the shift boss' part that the place was a reasonably safe and proper place for the plaintiff to be in.

"If an assurance that the place was safe or all right was made or given by the captain or shift boss to the plaintiff and rightfully and reasonably depended and relied upon by the plaintiff, under the circumstances just stated, plaintiff would have the benefit of such assurance no matter how the place happened to be or come to be in the condition in which it was.

"If the condition of the place where the rock which injured plaintiff fell from was called to the attention of the captain or shift boss, and fear or doubt was expressed to him by one or more of the workmen as to the safety of the rock or ground there, and if, after his attention was so called to the place, the captain promised or assured the plaintiff or the workmen generally that he would have the place fixed or secured, or that it would be fixed or secured, and if plaintiff heard and in good faith depended and relied upon such assurance or promise, then defendant itself would assume the risk of any injury to the plaintiff due to the rock falling away from that place for such a reasonable length of time after the making of such promise or assurance as you find from the evidence that the plaintiff reasonably might and could reasonably depend and rely upon such promise or assurance, reasonably expecting fulfillment thereof, and if, under such circumstances, such assurance or promise was made by the shift boss or captain and depended and relied upon by the plaintiff, and if plaintiff's injury occurred while he was at the place where his injury occurred, reasonably depending and relying upon such assur-

ance or promise and reasonably expecting the fulfillment of the same, then the plaintiff will be entitled to your verdict, unless the danger of remaining there or being there was so open, obvious, glaring, and imminent that a reasonably careful and prudent person in plaintiff's situation would not have been or remained there, under the same or similar circumstances.

"If such an assurance or promise was made to the plaintiff and relied upon by the plaintiff under the circumstances just stated, plaintiff would have the benefit of such assurance, no matter how the place happened to be or came to be in the condition in which it was.

"If such an assurance or promise to fix or timber the place was so made and relied upon, it would commence to operate to the plaintiff's benefit at once, and the plaintiff would be entitled to the benefit of such promise or assurance from the time it was made, until a reasonable time for its fulfillment had elapsed.

"If you find from the evidence that at the time of his injury plaintiff was in good faith and relying upon or obeying either an assurance of the safety of or a promise to fix or timber the place from which the rock which caused his injury fell, or upon an order to remain at work in the shaft, given by the captain or shift boss after the workmen, or some of them, called his attention to the condition of the place from which such rock fell and expressed fear or doubt as to its safety, and you further find that an ordinarily careful and prudent person in plaintiff's situation in the exercise of ordinary care would have been or remained where plaintiff was injured at the place where he was injured, under the same or similar circumstances, then I charge you that plaintiff was not guilty of any contributory negligence in remaining there, and you should so find by your verdict.   *   *   *

"The plaintiff did not by his contract of employment assume any but the ordinary risks of his employment. The ordinary risks of his employment are those which inhere in the service after reasonable care, skill, and diligence has been used and exercised in and about the performance of all of the duties which the defendant owed the plaintiff as his employer. All other risks are extraordinary risks which plaintiff did not assume by his contract of employment. Plaintiff

did not by his contract of employment assume the risk of any negligence on the part of the defendant or on the part of those employed or appointed by defendant to perform its nondelegable duties towards the plaintiff.

"If you find from the evidence that plaintiff's injury occurred in consequence of a risk not ordinarily incident to his employment, then I charge you that the burden of proof is upon the defendant to show by a fair preponderance of the evidence that the plaintiff knew of and appreciated the risk of his injury in time to have avoided it, if he desired to do so, before his injury occurred, and in such case, unless the defendant has maintained the burden of proof in this respect, you should find that plaintiff did not assume the risk of his employment.

"If the place from which the rock which caused his injury fell was in an unsafe condition and the plaintiff had knowledge of that fact, and he or somebody else in his presence and hearing called the attention of the shift boss and timber boss to the condition of the place, and if the shift boss or timber boss, after his or their attention was called to the condition of the place, ordered the plaintiff or the men generally including the plaintiff, to do the work which plaintiff was doing at the time his injury occurred (if he was in fact doing work at such time), and if plaintiff at that time was doing such work as it was so ordered to be done and at a place where it was so ordered to be done, then the plaintiff would not assume the risk of so doing unless the danger was so obvious that an ordinarily careful and prudent person in plaintiff's situation in the exercise of ordinary care would not have incurred it under the same or similar circumstances.

"If, while plaintiff was working below the forty-seventh level or in or about the shaft, other workmen were engaged in or about the timbering or securing the place where the rock which caused plaintiff's injury fell from, or doing any other thing to make that place safe for plaintiff and others to work under or near, then such workmen while so engaged, no matter who they were, would not be fellow-servants of the plaintiff, but would be vice principals of the defendant, and the defendant would be responsible to the

plaintiff therefor, if any of such workmen, while so engaged, were guilty of any negligence (either of commission or omission) and such negligence was the proximate cause of plaintiff's injury."

The plaintiff testified in part as follows:

"In a way I had experience in sounding walls or timbering places in the mine, inspecting them. I barred down loose, quite a lot, before I was hurt."

And again on cross-examination:

"I went into the shaft in the timber gang in November, 1909. From this time on till this accident happened, I was repairing this No. 2 shaft. We had to retimber that shaft for a long distance. We would have to remove loose rock. We retimbered the place up where this rock came out of. The shaft wouldn't have stayed open at all. We had to put sets of timbers to keep the shaft open so the skips could run. In many places we repaired the levels for a little ways close to the shaft, so that the trammers could go out on the levels and bring the rock out and dump it in the skips."

The work upon which the gang of which plaintiff was a component part was engaged at the time of the accident was erecting a "set" to secure the wall and roof a short distance from the shaft on the forty-seventh level and was a part of the general work of repairing then going forward. It was strongly urged on the part of the defendant that there was such a variance between the declaration and the proofs as entitled the defendant to a directed verdict. This variance consisted in the fact that, while the declaration charged that the plaintiff was injured while at his work in the shaft some 20 feet below the forty-seventh level, the injury, as a matter of fact, occurred upon the forty-seventh level some few feet distant from the shaft. We find it unnecessary, however, to pass upon this phase of the case.

We are convinced that a verdict should have been

directed in favor of the defendant upon the ground that the undisputed testimony showed that the plaintiff at the time of his injury was engaged with the other members of the timbering crew in making repairs to shaft No. 2 for the purpose of making that safe which had theretofore been rendered unsafe through the crushing in of the shaft. It was obviously a part of the plaintiff's duty, and that of his fellow-laborers, to bar down and carry away such rock as was loose and dangerous in the vicinity of their labor. This he himself had frequently done, and it was well known to him that the place was not a safe one. The danger of injury from falling rock in the process of making the place safe was one that he must be held to have assumed. Nor can it be said that the other members of his crew stood in relation to him as vice principals.

We have so recently determined this question in this court that an elaborate citation of authorities is unnecessary. See, however, *Petaja* v. *Mining Co.*, 106 Mich. 463 (64 N. W. 335, 66 N. W. 951, 32 L. R. A. 435, 58 Am. St. Rep. 505), and *Andrews* v. *Mining Co.*, 180 Mich. 72 (146 N. W. 394).

The judgment is reversed, and, as it is obvious that no different case can be presented on another trial, no new trial will be granted.

McALVAY, KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.