## VRELENICH *v.* CALUMET & HECLA MINING CO.

1. MASTER AND SERVANT—FELLOW SERVANT—TIMBER BOSS—SAFE PLACE.

> Where an employee in defendant's mine, working under the supervision of a timber boss, was injured by the fall of some rock in one of the stopes immediately after a blast, and where it appeared that his work at this time was timbering the mine, replacing some of the timbers which had become displaced, and that the timber boss made an examination of the stope, before plaintiff entered after blasting out a piece of rock, and the boss found the

hanging wall apparently safe, but did not call the men in or assure them that the place was safe, that he was accustomed to call the men after he had examined the condition of the rock, if he found everything safe, and that plaintiff knew about the custom and rule, he was not entitled to recover for his injuries.

2. SAME.

It is now well settled that the duty to provide a safe place is not applicable to those engaged in the work of timbering: the employer's duty being fulfilled when he has promulgated reasonable rules and properly instructed the servants, furnished suitable tools, machinery and materials for the work and engaged competent men to perform it.

Error to Houghton; O'Brien, J. Submitted June 23, 1915. (Docket No. 31.) Decided September 29, 1915.

Case by Steve Vrelenich against the Calumet & Hecla Mining Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*Allen F. Rees* (*Rees, Robinson & Petermann,* of counsel), for appellant.

*Le Gendre & Driscoll,* for appellee.

STEERE, J. While an employee in defendant's mine, plaintiff sustained two distinct physical injuries in accidents occurring at different times and places. This action was brought to recover damages for both injuries, each being distinctly charged in a separate count of his declaration. The earliest injury, charged in the first count, occurred February 18, 1909, at which time a falling tram car broke plaintiff's left leg below the knee. On July 24, 1911, while working as a timberman on the fiftieth level of No. 4 shaft in defendant's mine, a fall of rock from the hanging wall bruised his shoulder and broke his right leg. The latter acci-

dent is the subject of the second count in his declaration, and of this appeal.

The trial court submitted the case to the jury upon both counts in the declaration, with instructions to pass upon each accident separately and determine whether defendant was liable in damages for negligence causing either or both of the injuries counted upon. A verdict of not guilty was returned for defendant upon the first count, and upon the second a verdict awarding damages was rendered in favor of plaintiff. No questions relating to the earlier accident, charged in the first count, are before the court for review. Defendant's assignments of error relate only to the second count charging negligence in connection with the accident of July, 1911, when plaintiff was working as a timberman helping to make places safe for mining operations, and the important question raised is whether the trial court erroneously denied defendant's motion, and requests for a directed verdict of no cause of action urged on the ground that plaintiff's evidence failed to make a *prima facie* case of actionable negligence.

At the time of the accident under consideration the timber gang to which plaintiff belonged, consisting of four men and the timber boss, were at work in a stope on the fiftieth level, replacing some timbers which had been knocked down in the night, during the shift before, by blasting. On the following morning, when the timbermen came to this stope, the timber boss devoted some time, assisted by his men, in examining the hanging wall and environments with a light on a staff and barring down any loose rock found, as a protection for their own safety before starting the timbering. The men then commenced to shovel away some dirt, or broken rock, from the foot wall where timbers were to be set, and while doing this found a large piece of rock too heavy for them to move, of the size and

kind called a "block hole," which it is customary to break finer by blasting or otherwise. The miners working in the stope near by were called upon to re-blast this rock, so the timbermen could get it out of their way. This was done, the timbermen withdrawing together to a selected place of safety when the block hole was ready to blast, where they seated themselves and all waited until the blast was discharged and the smoke cleared away, after which the timber boss started first and went into the stope, where, as he testified, he made an examination of the hanging wall and vicinity in which the timbering was to be done, finding it apparently safe. The first to follow him was a timberman named Andrew, plaintiff's working partner, who went into the stope and had just begun work, having moved two or three shovelfuls of dirt, when plaintiff followed and joined him, also starting to shovel and some rock fell upon him from the hanging wall, inflicting injuries as before indicated. The timber boss, who was a short distance beyond them in the stope, had not then called the men to resume work, nor given any assurances that the place was safe, neither had he given any warning of danger. Plaintiff testified:

"It was our custom there, when there was a blast, for the timber boss to go in first and look the thing over. The timber boss always went first. When he thought it was all right he used to call us. * * * I didn't hear anybody call us into the stope that day."

Plaintiff was a man 52 years of age, experienced in copper mining operations. He first worked for defendant 14 years prior to the time of the trial, and stated that he worked in its mine as a trammer for 8 years before his first injury, during 2 years of which time he was a "$5 boss," but ceased to be a boss about a year before he was hurt. His explanation of the nature of his employment when injured, and the man-

ner in which underground operations were conducted, indicates intelligent understanding of and familiarity with the mining business and its dangers. Of conditions and methods he testifies in part as follows:

"My job this time was timberman. Timbermen are putting up timber, so they can get the rock out of that stope. I was hurt this time on the fiftieth level. * * * The vein in these mines lays between two walls of rock running down on a slant like that, about 38 degrees. The upper wall we call the hanging wall, and the bottom wall the foot wall. In taking out this rock they run a drift in the vein a certain distance and then work the rock out from the bottom. The stope was as long as 75 feet; that is, they block off 75 feet of the vein, and start to take that 75 feet up. The miners start in one place and go across the vein. They take out a layer right near the level first. That's what they call a cut. After that's taken out, they take another slice. After they go up, it's the timbermen's duty to follow them up and put these timbers in, so as to keep the hanging wall from coming down. That is right. The day I was hurt the stope had gone up about 50 feet. The timbermen had followed it up. They were after the miners. I think they had timbered the stope about 40 feet where we were working. At this place we were not very near to the miners. Some places they were as close as 4 feet, if they can catch up to the miners. * * * Those timbers are put in together some places 6 feet, and other places 8. They put timbers up in a stope of that kind to hold the hanging up, and so it won't come down. That's to make it safe for the men going up and down in the stope, so they can work. Just that time on the day I was hurt we were cleaning the dirt. That's part of the work of putting in the timber. We clear the dirt first before we put in the timber. By cleaning the dirt, I mean the timber is always put on the solid foot, not on the dirt. They don't cut hitches there, they just clear the dirt and set the timbers on the wall. I have been working at this timberman's job about 16 months before I got hurt, 16½, something like that. There were four men and the boss the fifth in our gang. * * * After a blast of that kind, it was the duty

of the timber boss to go in and take a look at the hanging, to see if it was all right; but I don't know if he did this time or not. He usually did. I saw him do it at various times. I saw him other days. The way they inspect the hanging wall is to put a light on the end of a staff, so they can get the light close to the hanging wall. If the boss sees something that doesn't look very good to him, he tells us to get away and pinches it down. Sometimes, when he can't do it alone, he calls for help. I mean, if he can't pinch it alone. * * * After the blast I didn't hear whether the boss asked Andrew to go up with him. I didn't hear anything. The timber boss didn't talk to me before he went up after the blast."

Under the testimony as to rule and custom, showing it was the duty of the timber boss in this mine to look out for the safety of the men under him, to give warning, inspect and direct, bar down loose rock from the hanging wall, etc., it is contended in plaintiff's behalf that his contract of hiring imposed upon defendant the nondelegable duty to furnish him a safe place at its peril, and the negligence of the timber boss, acting as vice principal, and imputable to defendant, was, under the evidence, an issue of fact to be submitted to the jury.

The duties of this timber boss in caring for the safety of his crew, while emphasized in the evidence and urged as imposing upon defendant the nondelegable duty of furnishing a safe place, are not, in their nature and as applied to the work in which he with his men was engaged, shown to be other or different in principle than those of timber bosses generally.

The timbermen's work is directed to making places in the mine safe, which, as they entered upon their work, are unsafe or uncertain. Plaintiff was an experienced timberman. He assumed the known risks of the employment, and knowing the rule, as he states it, for the boss to go first after a blast, and call the men if it appeared all right, he did not wait for a call, and

went into the stope without any orders or assurances of safety. In this particular there is a marked distinction between the instant case and *Danula* v. *Mining Co.*, 166 Mich. 350, 361 (130 N. W. 604), *Minkkinen* v. *Mining Co.*, 169 Mich. 279, 282 (135 N. W. 449), and *Scendar* v. *Copper Co.*, 169 Mich. 665, 666 (135 N. W. 951), cited and relied upon in plaintiff's brief as controlling in principle here. In each of those cases the plaintiff was assured by some one of experience and in authority over him that the place was safe, and ordered to begin or continue work there. Whatever uncertainty may have at one time arisen as to the scope of those cases, it is now made clear that the general rule announced in *Petaja* v. *Mining Co.*, 106 Mich. 463 (64 N. W. 335, 66 N. W. 951, 32 L. R. A. 435, 58 Am. St. Rep. 505), is unmodified. See, also, *Andrews* v. *Mining Co.*, 180 Mich. 72 (146 N. W. 394); *Kaaro* v. *Mining Co.*, 178 Mich. 661 (146 N. W. 149); *Zap* v. *Mining Co.*, 184 Mich. 437 (151 N. W. 554); *Juntunen* v. *Mining Co.*, 184 Mich. 341 (151 N. W. 571).

The facts in the latter case are similar in many respects to those before us. Juntunen was working in defendant's mine as a timberman, engaged with others of his crew in repairing old timbering a short distance from No. 2 shaft on the forty-seventh level, and suffered a broken leg from a fall of rock. His testimony was to the effect that the duty of inspecting for danger and caring for the safety of the workmen rested upon the captain and timber boss; that he relied upon their assurances that the place was then safe and worked there as directed. The doctrine of safe place and vice principal was invoked there, as here. It was held that, as the undisputed evidence showed plaintiff was, at the time of his injury, engaged with other members of the timber crew in making repairs "for the purpose of making safe that which had theretofore been ren-

dered unsafe through the crushing in of the shaft," a verdict should have been directed in favor of defendant.

With these timber gangs moving from place to place in the mine, engaged in the work of making places safer for mining operations, it is now well settled that the doctrine of safe place is not applicable to such employment, and the employer's duty is fulfilled when reasonable rules are promulgated, the workmen properly instructed, suitable tools and material furnished for the work, with competent men to perform it. The custom or rule that the timber boss should first go into the place where a blast was fired, inspect conditions, and notify the other timbermen did not constitute him a vice principal. His general status and relation to the other timbermen of his crew, as shown in this case and others of like nature, is well stated by Andrew, plaintiff's partner, as follows:

"The timber boss is an ordinary timberman, with a timber gang of four or five men. He does the same kind of work that the other timbermen do, only he has the say as to where the timber shall go in; that is what the timber boss is. All of the timbermen are supposed to keep their eyes open, and if they see a bad hanging to take care of it by putting in timbers; that is the entire work of a timberman."

For the foregoing reasons, and under the precedents referred to, we are constrained to conclude that this judgment must be reversed, and no new trial granted.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.

The late Justice MCALVAY took no part in this decision.