## MAXWELL *v.* ELK CEMENT & LIME CO.

Master and Servant—Fellow-Servants—Negligence.

An assurance by the superintendent to an employé of the defendant that he had stopped the machinery and it would remain so while plaintiff climbed on it to put out a fire, was an act of a fellow-servant, and the defendant is not liable for injuries received by reason of the unexpected starting of the machinery, in the absence of proof as to the cause.

Error to Emmet; Shepherd, J.  Submitted April 26, 1909.  (Docket No. 97.)  Decided July 15, 1909.

Case by Asa G. Maxwell against the Elk Cement & Lime Company for personal injuries.  A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error.  Affirmed.

*W. S. Mesick* and *A. B. Dougherty*, for appellant.

*Bundy, Travis & Merrick* (*Fitch R. Williams*, of counsel), for appellee.

Moore, J.  The plaintiff was injured while in the employ of the Elk Rapids Portland Cement Company.  The defendant is the successor to that company, and it is conceded that, if the former company was liable to the plaintiff, he is entitled to a judgment against defendant.  The plaintiff was hired by Mr. Bunce, the general superintendent of the mill.  He worked at various things about the plant, blacksmithing, putting up buildings, making repairs, millwork, and such things as he was directed to do either by Mr. Bunce or by Mr. Rankin.

It is the claim of plaintiff that he was told by Mr. Bunce that Mr. Rankin was master mechanic, and to obey his orders.  His account of the accident is as follows:

"On the 30th day of December, 1902, in the afternoon of that day, I went into the annex north of the mill. At the beginning we had done a little work there just before dinner, something, I don't remember just what now. But I had some tools there that I had left there, and I went back in the afternoon after them, and I saw this friction clutch. It had been working a little too tight, and it 'het' and was burning. I could not say whether it was blazing or not at that time. It was smoking at least, and it had to be put out. And he instructed me to get a pail of water. At that time I think the water was all shut off around the plant. It was in the winter time, and the pipes had burst and everything, but I knew where there was a pail, and I went out and got that. There was a ladder standing out there from the concrete pier. It would be hard for me to explain it to you without a drawing or something. I walked up on this ladder until I got up nearly to the top of the pier, and I saw that I couldn't do anything in that position with the machinery running, and I stopped there, and when Mr. Rankin came back— He had stepped out and was gone a minute or so, and he came back and asked me why I did not get up and put the fire out.

"*Q.* He had first told you to put out the fire?

"*A.* He told me to go up and put out the fire—get a pail of water and put out the fire. But I could not reach the fire from the floor. It was too high up. It ran over my head, and I could not stand on the floor and take the pail of water and get the water on the burning parts. As I only had one pail to work with, my idea was to make the water go as far as I could. It would be troublesome to get another pail of water at that time. Mr. Rankin asked me while I stood in that position on the ladder there why I did not get up and put out the fire. And I told him that I could not do anything with the machinery running. He stood there and looked at me for a minute. I told him that if he would stop the engine I would put it out in a minute. And he disappeared and went in the direction of the engine. The machinery stopped shortly afterwards, but I did not step over until he came back into the door of the annex, and then he asked me why I was not putting out the fire. And then I told him that I wanted to know that the machinery was going to stand still. He said: 'She's all right. She will lay still now.' At that I stepped one foot on the concrete pier and the

other on the shaft, and began pouring water onto the clutch to put out what I could reach. And even from that position I could not reach it all. Mr. Rankin at that time was standing right in front of me. I didn't see anyone else. I didn't notice anyone. After I had done what I could I reached out the pail for him, and he was just in the act of taking it when the shaft started, and it threw me into gear, and I was caught and my arm was crushed to pieces."

No other eyewitness to the accident was sworn. It was shown that the shaft could be stopped either by stopping the engine or by throwing a clutch, the latter method being very easy and very simple. Neither the engine nor the clutch was in the room where the accident happened. It is very clear the shaft was not started by any act of Mr. Rankin, for plaintiff testified that Mr. Rankin was standing just in front of him when the shaft started. There is no evidence in the record as to what started the shaft to revolving after it was stopped. No testimony was offered on the part of defendant. The judge directed a verdict in its favor.

It is the claim of the plaintiff that error was committed in not admitting certain testimony. We do not think these assignments of error are well taken. The important question is whether the case should have been submitted to the jury. It is the claim of plaintiff that it should have been, because he followed the direction of Mr. Rankin, who was the *alter ego* of defendant. A comparison of the record in this case with that of *Guest* v. *Illuminating Co.*, 150 Mich. 438 (114 N. W. 226), will make it difficult to distinguish them. See, also, *Amoe* v. *Engineering Works*, 151 Mich. 212 (114 N. W. 1010); *Corey* v. *Iron Co.*, 151 Mich. 558 (115 N. W. 737).

Judgment is affirmed.

MONTGOMERY, OSTRANDER, HOOKER, and BROOKE, JJ., concurred.