## MESICH v. TAMARACK MINING CO.

1. MASTER AND SERVANT — MINES AND MINING — TRAMMERS — FELLOW-SERVANTS—PERSONAL INJURIES.

In an action brought by an employee of a mine known as a trammer, whose work was to shovel out ore or dirt as it is mined and to deposit the same upon cars, for injuries which he sustained by the alleged negligence of another employee, described as a block-holer, whose work required him to break up large masses or blocks of ore and roll or force them down the stopes or inclines to the levels of the mine, where they could be moved, plain-

tiff assumed the risk of the negligence of such co-employees and was not entitled to recover for the failure of one of them to warn him of impending danger from a piece of rock which was rolled down from the stope.[1]

2. SAME—ASSUMPTION OF RISK.

The servant assumes all the usual risks of his employment, among which is the risk that a fellow-servant will sometimes be careless and injuries will result. The master is merely required to be reasonably prudent in choosing servants and in retaining them in his service after unfitness or negligence has disclosed itself or been communicated to him.

3. WARNING SERVANT—NONDELEGABLE DUTIES.

Negligence of the servant in failing to give signals to his fellow-employee is not negligence which involved defendant as for failure to perform a nondelegable duty; having engaged a competent block-holder to perform the duties connected with that employment the defendant had discharged its complete duty.

Error to Houghton; Cooper, J., presiding. Submitted November 16, 1914. (Docket No. 52.) Decided March 17, 1915.

Case by Mike Mesich against the Tamarack Mining Company for personal injuries. Judgment for defendant upon a directed verdict. Plaintiff brings error. Affirmed.

*Le Gendre & Driscoll,* for appellant.

*Allen F. Rees (D. L. Robinson* and *Albert E. Petermann,* of counsel), for appellee.

STEERE, J. On May 23, 1910, while working as a "trammer" on the thirty-third level of defendant's copper mine in Houghton county, plaintiff was struck and injured by a large rock thrown down the incline of a stope at the foot of which he was shoveling by

---

[1] On the question whether servants in mines are fellow-servants, see note in 50 L. R. A. 437, 461.

a block-holer named Reily, working about 30 feet above. Plaintiff claimed that the rock was sent down without warning. This Reily denied, claiming that he gave the customary notice before starting it. That issue of fact becomes immaterial here, and it is to be assumed for the purposes of this inquiry that the jury would have decided it in plaintiff's favor, as a verdict was directed for defendant at the conclusion of plaintiff's testimony on the ground that the block-holer was a fellow-servant of the trammer, and defendant could not be held liable for the negligence of a fellow-servant in not giving warning, although it might have been the practice amongst the workmen to do so. The controlling question presented, therefore, is the old and oft-repeated one of vice principal and fellow-servant.

While the common purpose and result of all activities of employees underground in a mine is to break and get to the surface the metal-bearing rock there found, in a large mine of this nature, with many men engaged, their immediate duties are apportioned, and each assigned to a particular kind of work, generally according to experience, skill, and intelligence. Descriptive names, suggested by their special duties, are used in designating them, such as captains, shift bosses, inspectors, timbermen, miners, barmen, block-holers, and trammers. The miners', block-holers', and trammers' duties are closely connected in the particular that they are directly engaged in getting out the desired ore or rock, reducing it to a condition to be handled, and starting it toward the surface for transportation to the stampmill. Their work is most directly involved here. The miners work along the mineral-bearing vein between the foot and hanging walls, drilling, blasting, and breaking out, or down, the rock, ore, or "dirt," as it is often termed, doing, as their name implies, the actual mining. Occasionally pieces of the material as blasted and broken out

by the miners from the solid vein are not all reduced sufficiently fine to be readily handled, and some of the blocks or pieces of rock are so large that they block or clog the holes or openings between timbers where this broken material runs down the incline of a stope, or raise, to the level. The block-holers' duties require them to break up and reduce to safe and convenient size, by blasting or otherwise, such large blocks or pieces of rock. During their hours of duty they go from one level of the mine to another in the territory assigned to them, following up the work of the miners, looking for and breaking up such pieces, and in connection with that work starting them, as well as other large pieces which can be moved without breaking, down the inclines to where the trammers can conveniently handle them, and at times when those duties are performed they pass down dirt or work the material towards the place of loading the cars to facilitate the work of the trammers. The trammers are common laborers who, working chiefly with shovels, load the rock into tram cars and push them out from the stope to where they are attached to cables which haul them to the shaft. In loading the cars they also at times, when conditions require, go up or back into the stope and pass dirt towards the cars.

The "stope" in a mine is an excavation made in removing the ore which has been opened up, or made accessible by shafts and drifts or levels. In this mine the levels were about 100 feet apart. Plaintiff was working in an old, untimbered stope on the thirty-third level, connected with No. 5 shaft east of the vein. The place in the stope where he was injured was about 300 feet long, and ran diagonally up to the thirty-second level. Between the upper or hanging wall and lower or foot wall was a distance of 23 or 24 feet. There were three or four upright timbers about 8 feet apart standing some 3 feet back of the tram track in the drift; but nothing else to prevent

rocks rolling down the stope or raise to the drift where plaintiff was at work. The block-holers going through the different levels worked in pairs; the trammers worked together in irregular numbers according to convenience and necessities of loading. On the occasion in question plaintiff worked with two other trammers loading tram cars at the spot indicated.

Three witnesses were sworn, plaintiff, Reily, the block-holer who threw down the rock that did the injury, and another of the trammers, who gave evidence through an interpreter confirmatory, so far as material here, of plaintiff's testimony. Briefly stated, as bearing upon the duties of the trammers and block-holers in that mine, and what each was doing at the time of the accident, plaintiff testified that his duties as a trammer were shoveling dirt or copper rock into a car which stood on the track running along the level where they were loading; that was the trammer's business, and they were not allowed to spend any time looking around or after the place where they were working; that at the time he was hurt he was shoveling rock into the car at the footwall in the level, and the rock came down from the rise in the stope; that no one gave him any warning that it was coming, and he had no knowledge that there was any danger of its doing so; that a short time before the accident he saw the block-holers go up into the stope, and heard them say something to some of the trammers as they passed by, but he did not pay any attention, and did not know what they were doing up there; that he had no time to look, and did not look, because they had to get out at least 16 cars, and he was busy at his work; that he was not supposed to pay any attention to the block-holers before getting the warning from them, it being their duty to give the trammers warning when they threw down their material. He first saw the rock when it was a yard or two from him, and tried to escape, but it struck him on the leg, breaking

or crushing his ankle and injuring him severely; that the block-holers, who were supposed to make it safe for the trammers and give them notice, came around once or twice a day, and, if there were any big rocks that the trammers could not move, would break them up by blasting if necessary; besides this, if they found any big rock in the stope, they would throw it down for the trammers, and they sometimes examined the hanging wall in place of the timbermen; "besides that, they would shovel some of the loose dirt down to the level once in a while, and that was part of their work; * * * help us by breaking big rocks or shoveling them down towards the level;" that sometimes the trammers themselves would go up and shovel the rock down if they didn't have any dirt on the level.

Reily, who was yet in defendant's employ at the time of the trial, and, as stated in the brief of plaintiff, was called for examination under the statute, testified on this subject: That the trammers are hired to shovel rock into the cars and push them out where they are attached to the cable, having to hustle most of the time at their own work, and are not supposed to pay attention to anything else except their work. That witness worked as a block-holer, which brought him in connection with the trammers right along on the different levels. That he knew practically all the rules and customs of the mine. As a block-holer he had to break up and throw down rock from the levels, stopes, and raises, and blast the rock where necessary, throwing the rock down where the trammers could get hold of it. When the block-holers were working above the trammers they are supposed to give the trammers notice when they are going to blast or throw down any rock. That duty of warning them of danger was imposed on the block-holers. That on the day plaintiff was injured, in the course of his duties as a block-holer witness went into the thirty-third level and to the stope, or raise, up from

the level where the trammers were at work, accompanied by his partner, who since died. On going up there they found a large rock which they threw down. It was on the footwall, and they barred it off and rolled it over, giving the trammers warning before doing so, as was their duty. That such was the custom and rule of the company. That the trammers had a right to, and did, rely upon being given such notice under the rules and custom which there prevailed. That in going from level to level, breaking up these large rocks and sending them down, if during their shift they had nothing else to do, they were supposed to help the trammers pass down the dirt, which they did, and when they came back to this level the trammers did not have much dirt, so they went up and ran some down for them at their request.

We need spend no time on the question of whether these men were fellow-servants in the work at which they were engaged. It was manual labor, for the same employer, at a common employment. They were engaged not only in the same general business of mining, but in a similar line of work, handling the rock, after it was mined, in the course of getting it to the surface. While each had certain duties to perform in that connection, their work at times so interlocked that each did identically the same thing. The trammer and block-holer were more closely associated in the line of their duties than the trammer and miner; the block-holer's services being intermediate and devoted exclusively to aiding in the work of moving the rock to the surface after it is mined. In *Petaja* v. *Mining Co.*, 106 Mich. 463 (64 N. W. 335, 66 N. W. 951, 32 L. R. A. 435, 58 Am. St. Rep. 505), where the question of negligence on the part of the miners resulting in an injury to a trammer arose, the court said that, if it was the fault of the miner, "it was the negligence of a fellow-servant under the plainest rules."

184 Mich.—24.

"Generally employees working in or about a mine, quarry, or other excavation are fellow-servants." 26 Cyc. p. 1348, citing numerous cases.

In *Schroeder* v. *Railroad Co.*, 103 Mich. 213, 215 (61 N. W. 663, 29 L. R. A. 321, 50 Am. St. Rep. 354), Justice GRANT thus tersely states the situation in cases like the present, in apt language:

"The doctrine of nonliability for the negligence of a fellow-servant is so firmly established, and has been so frequently affirmed, in this State, that I deem it unnecessary to cite the authorities. The difficulty has always been in determining whether the servant whose negligence caused the injury was, under the facts of each case, the *alter ego* or a fellow-servant."

And Justice MONTGOMERY, in a concurring opinion, as to reversal, states the rule as to nondelegable duties of the master as follows:

"In general, we think the true test is whether the person alleged to be a representative of the master is engaged in the performance of an act which it is the duty of the master to perform for the protection of his employees,—such a duty as that of providing a safe place to work, and safe machinery and appliances; exercising due care in the selection of servants engaged in the same employment; giving proper directions as to use of dangerous machinery by inexperienced employees; and the establishment of proper rules and regulations for the conduct of the business."

This statement of the test follows the line pointed out by Justice COOLEY in *Quincy Mining Co.* v. *Kitts*, 42 Mich. 34 (3 N. W. 240), where it is said in that connection:

"The servant assumes all the usual risks of his employment, and among these is the risk that fellow-servants will sometimes be careless, and that injuries will result. All that can be required of the master in that regard is that his servants shall be prudently chosen, and that they shall not be retained in his service after unfitness or negligence has been discovered and has been communicated to him."

In the instant case the only negligence, charged as a nondelegable duty not performed, is the failure of Reily to shout a warning when he himself was about to send down the rock, as by rule and custom it was his duty to do. He is shown to have been familiar with that rule, an experienced man well posted in the duties of his employment, and there is no evidence or claim that he was incompetent or had previously failed in this or any other duty.

Counsel for plaintiff cite in their brief certain authorities bearing largely on the question of duty to warn and give notice, several from other jurisdictions not altogether in harmony with the rulings of this court, and say:

"From the foregoing authorities, and numerous others, it is clear that the law imposes the duty of making and keeping plaintiff's place safe upon the defendant. But, regardless of that, it appeared by the evidence here that the plaintiff was relieved of that duty, and was prohibited from performing it by the defendant. This distinguishes this case from those in which the safe rule is held inapplicable. There can be no longer any doubt in this State that, 'where a duty is assumed by the master, or is imposed upon him by contract, or is customarily performed by him, it becomes a nondelegable one' "—citing *Baker* v. *Railroad Co.,* 169 Mich. 609 (135 N. W. 937) ; *Scendar* v. *Copper Co.,* 169 Mich. 665 (135 N. W. 951) ; *Oiva* v. *Mining Co.,* 178 Mich. 645 (146 N. W. 181).

The *Baker Case* was affirmed by a divided court on the theory that defendant violated a contract duty which decedent had a right to rely upon relative to cutting hose and chains on passenger trains. The quotation extracted from the case was taken from a text-book on Personal Injuries on Railroads. As the case was affirmed by an equally divided court, what was there said cannot be regarded as controlling precedent elsewhere. The *Scendar Case* involved purely a question of safe place and the danger from overhanging rock where plaintiff was at work. The

danger was in the place itself, and not from some temporary and immediately dangerous thing which a fellow-workman might do resulting in injury because he failed to warn. That case was disposed of on the theory that it was in the first instance the duty of the defendant to make the place safe; that plaintiff had been assured that this would be done; and that the captain, shift boss, and others over him were designated as vice principals charged with the nondelegable duties to watch, inspect, and see that it was kept in safe condition, and, proper inspection not having been made, their default was that of the master. The *Oiva Case* involved the question of a safe place in its physical features. The case was submitted to the jury under a lengthy charge, and a verdict rendered for defendant. Errors assigned and considered related to the charge of the court. These were carefully reviewed in detail, and the charge sustained as correctly covering the issue involved, which was stated by the court to be as follows:

"What the plaintiff claims, in substance, is that he was not furnished a safe place in which to work, and a further claim that he was set to work in an unsafe place upon an assurance that it was safe. Assuming that he himself exercised proper care, he was entitled to recover if he established either proposition. * * * The court, whether it was necessary or not, seems to have had in mind the rule that, where a duty is assumed by the master, or is imposed upon him by contract, or is customarily performed by him, it becomes a nondelegable one."

We find nothing in the cases cited controlling here; no complaint is made in the instant case that the place where the plaintiff worked was, as to its physical conditions, an unsafe place in itself. So far as shown, it was safe, and would have continued so but for the fact that Reily, a fellow-servant, made it unsafe for a brief period by rolling down a stone, which might have been easily avoided if he had given proper

warning, as was his duty. Not the condition of the place itself, but his neglect to give warning according to rule and custom, was the culpable delinquency. No duty of inspecting, to keep the place itself safe and in repair, is involved here. No inspection of the place would disclose a probability or possibility that Reily would at any time default in his duty to give warning.

From cases to which we have already referred and others of like import, it must be taken as the settled rule in this State that the master who has provided a safe place, proper appliances, and competent employees fully instructed as to their duties, and has established proper rules and regulations for safe conduct of the business which are made known to them, is not liable for the negligence of an employee failing to notify a fellow-servant of a transitory or temporary danger caused by his acts which will for the moment render the environment unsafe, but which can easily be avoided by a due warning it is his duty to give under rules of which all interested employees have knowledge.

The negligence of a workman to give warning of some act about to be done by him, and which may be dangerous to a fellow-servant, does not come within the scope of the safe place or duty to inspect doctrine in this jurisdiction.

"Frequent attempts have been made to bring the negligence of fellow-servants deputed to give signals within the scope of the principle that the duty to maintain a safe place of work is nondelegable. But this contention is rejected (except in Washington, where a servant who has been designated to give signals which control the movements of machinery is, while so acting, held to be doing the work of the master)." 4 Labatt on Master and Servant (2d Ed.) § 1537.

In *Mikolojczak* v. *Chemical Co.*, 129 Mich. 80 (88 N. W. 75), it appeared plaintiff was injured while

working with others at undermining and breaking down a large quantity of salt in defendant's plant. At certain times employees went upon the top of the salt pile above where others were at work, and, with bars or wedges, broke off large masses amounting to several tons, which would fall forward upon the floor. It was a regular custom for the men who went upon the top and did that work to give warning when ready to break down the pile. A foreman was in charge of the work going on there, and the negligence claimed was his failure to see that such warning was given at the time of plaintiff's injury. The court there said:

"The defendant had performed all the duty the law required of it in providing a competent man to attend to the duties of yard foreman, and to direct and assist its employees in the performance of the labor for which they were employed"—holding that the negligence was that of a fellow-servant.

However persuasively authorities cited from other States may be urged and argued, they cannot be indorsed in disregard of the settled rule in this State, established by a series of decisions extending over many years. We are impelled to the conclusion that the learned circuit judge correctly found and charged, as a matter of law, that, under the controlling decisions of this State, the negligence complained of was that of a fellow-servant, for which defendant could not be found liable.

The judgment is affirmed.

BROOKE, C. J., and MCALVAY, KUHN, STONE, BIRD, and MOORE, JJ., concurred. OSTRANDER, J., did not sit.