LESH v. TAMARACK MINING CO.

1. MASTER AND SERVANT — MINES AND MINING — NEGLIGENCE—FELLOW-SERVANTS.

Where a trammer employed in defendant's copper mine was engaged in cutting out ore from a stope which had not been timbered, and the attention of the miners employed in the work of preparing the shaft for other laborers had been called to a rock which other employees considered as dangerous, and they had replied that they would take care of it in about fifteen minutes, and advised decedent that it was safe to work below the rock, which, during the delay, fell and injured decedent, the miners so engaged were fellow-servants of the trammers who assumed the risk of their negligence.

2. SAME—ASSUMED RISK—PROXIMATE CAUSE—NEGLIGENCE.

Decedent assumed the risk of the obvious dangers connected with his employment, and where it was apparent to him and his co-employees that an overhanging rock in the stope in which they were working was likely to fall, and decedent continued to work under it, relying on the promise of the miners to blast the rock in about fifteen minutes, the proximate cause of the injury was not the negligence of such miners but the act of decedent in remaining at his work subject to a known and imminent danger.

3. SAME—PROMISE TO REMEDY DANGER—ASSUMED RISK.

No promise of the miners that they would blast the rock which plaintiff complained about as dangerous could be treated as given in a representative capacity so as to be binding upon the defendant mining company; nor was a promise on their part to remedy the existing danger sufficient to charge the defendant with liability for negligence.

Error to Houghton; Cooper, J. Submitted April 20, 1915. (Docket No. 42.) Decided June 7, 1915.

Case by Louisa Lesh, as administratrix of the estate of George Maresich, deceased, against the Tamarack Mining Company for the negligent killing of decedent. Judgment for defendant on a verdict directed by the court. Plaintiff brings error. Affirmed.

*Le Gendre & Driscoll,* for appellant.

*Allen F. Rees* (*Rees, Robinson & Petermann,* of counsel), for appellee.

STONE, J. Plaintiff, as administratrix of the estate of George Maresich, deceased, brought this suit to recover damages for fatal injuries sustained by deceased at about 11:50 p. m. on May 27, 1911.

Deceased was working for defendant as a trammer. The injury occurred in the 14th level of defendant's North Tamarack shaft in consequence of de-

ceased being struck by a cone-shaped piece of rock weighing over six tons. This rock rolled down through a stope and mill, and struck deceased while he and two other trammers were engaged in loading another rock from the sollar into a tram car in said level. Before this rock rolled down it had been standing on the foot wall and leaning against a battery in the stope, about 25 feet above the place where deceased was working when he was struck by it. It had been standing and leaning in that position for at least four days before the accident.

Plaintiff called for cross-examination under the statute Thomas Hosking, defendant's shift boss, and also deceased's two trammer partners, who were the only witnesses sworn. At the close of plaintiff's evidence, the trial court, on defendant's motion, directed a verdict in favor of defendant, and a judgment accordingly followed. There was no motion for a new trial, and the plaintiff brings the case here on writ of error. This was a copper mine. The copper rock lay between two other slanting strata of rock, the upper of which is called the hanging wall, and the lower, the foot wall. These walls were composed of solid rock, and the general pitch of the vein is about 37 or 38 degrees from the horizontal. The shaft at this level was east from the foot wall. A crosscut was run west from the shaft through the foot wall to connect with the 14th level. This level ran north and south, and was about 20 feet wide and 16 or 18 feet high, and was a permanent passageway in the mine. The accident happened about 800 or 900 feet south from the intersection of the crosscut and level. The stope in front of which it happened, was the first stope south of the crosscut. The level ran about 800 feet south from this stope. The levels are 100 feet apart, and the stopes when completed are nearly 100 feet high. In the stope where the accident occurred

there were three rows of batteries, from 6 to 8 feet apart. It was a regular working stope in defendant's mine, where drilling, blasting, and tramming were going on in the usual way. Two miners were working in it at the time. The stope was being developed by excavating all of the copper rock from between the hanging and foot walls. It was timbered and being timbered with large stull timbers, which extended from the foot to the hanging walls, about 25 feet from the level. In the level were permanent car tracks upon which tram cars (of 2½ tons capacity) were operated in conveying the rock to the shaft. In mining out the copper rock from this stope by the miners, it was passed or thrown downward along the foot wall to the level, through places in the stope called mills. These mills were separated by the batteries. Three stulls placed close together, and put in at the pitch of the vein, ordinarily constituted a battery. These batteries were 2½ feet or more in diameter. They were situate from 6 to 8 feet apart up and down, and crosswise of the stope. No guards were provided to prevent rock rolling from the stope or mills into the level. In fact, the object was to get the rock down to the level. At the side of the car track, in the level at the bottom of the mills, sollars were constructed. A sollar is a place or platform, from which the trammers shovel or throw the rock into the car. Dynamite was used in mining and excavating the rock from the vein. When blasts were set off the vein rock would be blasted into chunks of various sizes. The mining and excavating of the rock were done by men called miners. The dynamite was kept under lock and key. The trammers were not furnished with, or permitted to use any dynamite. In referring to the miners' duties, the shift boss testified:

"Sometimes, if the miners haven't any drilling to do, or can't do nothing on their machine, they would

be running rock. If they are working up back in the stope, and blast, they don't run that rock down to the sollar for the trammers to take from there. That's the duty of the trammers to take it from the stope. If there isn't any on the sollar—that is, further up—they go up and run it down themselves. And when I say the only thing they have to do was to shovel rock and push cars, I mean in addition to that, if it was necessary, they had to go up stope and run this rock down to the sollar where they could get at it; they had to get their own dirt to fill the car. If, in doing that, any danger arose in running it down, it was up to them to see they didn't get hurt. Not to my knowledge it never was the duty of the miners. The men running the rock down the rock pile could see the danger for himself. So when I said it was the miners' duty in every respect to take care of the safety of the trammers, overhead, I meant I limit that to the hanging wall and the pile. That's up to them, the trammers, running the rock down the sollar."

Kosovac, one of the trammers, testified:

"Now our business as trammers was to take the rock the miners broke out there, and it was the miners' business to drill and blast the rock out, so that we could take it away. * * * Yes; when there is lots of rock in the stope, and they [the trammers] shovel the bottom, the rocks come down themselves. When we get none on the sollar we go and roll it down with the shovel."

In other words, as we understand the record, the trammers frequently went up into the stopes to get down the loose rock lying on the foot walls; that was a part of their regular duty. Sometimes, as in this instance, large rocks would be blasted, and loosened from the vein, and would rest on the foot wall, and it would be necessary to blast and break them.

The places where the trammers worked were prepared by miners and their timber men. Deceased, a young man 23 years of age, born in Croatia, had been in this country three months, and was injured while

working on his twenty-third shift. He had not worked in a mine before. His associate trammers were men of experience in the work.

At about 15 minutes to 12 o'clock on the night of the accident the trammers placed a car for loading on the track in front of the mill. The rock which caused the injury was leaning against the third battery up from the level. It was about 4 feet thick and 9 feet long. The trammers noticed this rock. What took place is thus described by the trammer Kosovac:

"Maresich said that it wasn't safe to work under that rock. He told me to call the miners and ask them whether it was safe to work under that; then I called the miners. I asked the miners whether it was safe to work under, and they said, 'Yes.' I asked them to blast it, and they said they would blast it at midnight. And that would be our dinner time, on night shift. We trammers were down below the rock, and the miners were up above it. No, I couldn't see the rock as well from under as the miners could from above. They were looking at it. No; they only said it was safe; that the rock was safe. Yes; they said they were going to blast at midnight. When I took the bar to bar it down, they told me to leave it alone. The miners said they were going to blast this block hole at midnight. When I told the miners—when George and I told the miners the rock would fall down, then they told us— George asked me to ask them whether the rock was safe. They said it was safe. They will blast that rock at midnight. I told George what they said to me. * * * Yes; I did talk to these miners that night when we fetch out the last car. That rock, when we take that rock away from there, and I talk to George there, and I tell George that I am afraid of that rock; it is liable to come down. It was 14 minutes to 12. That was the time that I did talk to George. George told me to ask the miners. I tell the miners to go and look at that rock, because I am afraid 'he' ain't very solid, and to go and blast it. * * * This accident happened just about 5 minutes after that. I did see 'him' up in the stope; that 'he' was standing up. I took the bar and went up in the stope and try to bar 'him' down; but the miners

tell me not to do it—let it go. Yes; it looks to me that 'he' will come down, and we was afraid of it. Yes; I did tell George about it.

"*Q.* Now, anybody who went up in the stope and looked at that rock could see exactly what you saw, couldn't he?

"*A.* Yes, it would be just the same. The miners told us it was safe, and we was work there. But nobody could see more than I saw who went up and looked at it. Miners couldn't see any more than I could see."

The record is entirely silent as to how the rock got away, and rolled down the stope and injured the deceased.

By separate assignments of error the entire charge, paragraph by paragraph, is claimed to be erroneous. The charge was as follows:

"The motion of the defendant to direct a verdict in favor of the defendant will be granted.

"I am of the opinion that this case is governed by the case of *Petaja* v. *Mining Co.,* 106 Mich. 463 [64 N. W. 335, 66 N. W. 951, 32 L. R. A. 435, 58 Am. St. Rep. 505]. It seems to me that if one case ever fell directly within another case, this one does within the *Petaja Case.* Just compare the two cases.

"The plaintiff in that case was a trammer, just as this decedent was. Justice HOOKER, on page 466 [of 106 Mich., on page 335 of 64 N. W.], says:

"'This ore was loaded upon cars and removed by common laborers, called "trammers."'

"So the Supreme Court considered them simply common laborers. Now the opinion in the record shows this to have been the situation in the *Petaja Case.* The miners drilled and blasted down the ore, and after blasting down the ore they pinched down the loose rock that was at the roof of the room and prepared that room so it would be safe for the trammers to come and work under them. Then these trammers, called common laborers by Justice HOOKER, came in, and all they had to do was to load the ore into the tram cars. The miners had looked after the safety of the room. After enough ore was

loaded and trammed by the trammers in the *Petaja Case,* so that another set of timbers could be put in, then it became the duty of the miners—not the trammers but the miners—to see to it that the timbermen were notified, and the timbermen would come in and put up a set of timbers. Just as soon as there was room, the mine was timbered as fast as there was room for timber, and the practice there would be after this set of timber was put up and the ore blasted down and taken away, then the miners would proceed to blast down another space. Now the trammers had nothing to do with whether another set of timbers would be put up. In fact, the *Petaja Case* shows they had nothing to do with the question of their safety. That was looked after by the miners and the timbermen and the shift boss. The shift boss, of course, was over all.

"Now, it seems in the *Petaja Case* the trammers saw what they thought was unsafe ground, an unsafe place there; they thought they saw rock which might fall and they went—they didn't go to the miners, but went to the shift boss, who was the superior of all, and they said to the shift boss that they thought the place was dangerous and the shift boss went in and made an inspection and he assured them that it was safe and told them to go back to work, and they, relying on his superior judgment and his inspection, returned to work, and in about 30 minutes the plaintiff was injured by a fall of ground where he was afraid it would fall and where he notified the shift boss that it looked rather dangerous.

"Now the Supreme Court expressly holds that the miners in doing their work—now the work referred to was the work that was done by the miners, and that is, blasting down this rock and pinching down the loose rock after the blast and in notifying the timbermen when there was space for another set to go up, doing all that work, that's the work the Supreme Court are passing on. The Supreme Court says the miners are the fellow-servants of the plaintiff, the trammer, and that the defendant is not liable.

"They also say that the timbermen in coming in to put in this timber are fellow-servants, and if there was negligence in the way that was done, it was negligence of fellow-servants.

"The Supreme Court goes further and says the shift boss, being called there to come in and inspect this room and look it over, he was acting as a fellow-servant and not as a vice principal. On page 467 [of 106 Mich., on page 335 of 64 N. W., 32 L. R. A. 435, 58 Am. St. Rep. 505] it says, the opinion reads (the testimony differs about the width of the roof) :

" 'There is evidence that it was not sufficiently cleaned out to permit of timbering at the time of the accident, and this does not seem to have been disputed. Some indications of danger were noticed by the trammers, who called the attention of the shift boss to it.'

"Now the record shows just what those indications were, falling ground.

" 'But, after looking at it, he told them it was all right, and to "quit monkeying" and resume work, which they did. The accident occurred about 30 minutes later.'

"They show in the opinion that the shift boss was called on to inspect the place and he did and assured them it was safe.

" 'The undisputed testimony shows that the trammers and miners had not put the newly opened space in condition for the timbermen, and that the miners had not caused them to be notified that their services were required.'

"I leave out some that does not apply here.

" 'If there can be said to be culpable negligence, it was either in mining too large a space before cutting out the corners preparatory for the sets, or in failing to notify the timbermen it sets could have been put in before the ore was still further removed. In either case, if the fault of the miner, it was the negligence of a fellow-servant under the plainest rules.'

"Now the opinion goes on :

" 'And the same is true, if it was through the failure upon the part of the shift boss to cause timbering to be done earlier. He was a foreman, who directed when and where blasts should be put in and where the men should work, and who was appealed to to settle questions arising as the work progressed.'

"Now he was appealed to in this case to go in and settle the danger of this place. He inspected it and said it was safe. If the shift boss is brought in and

inspects the place and says it's safe, and is a fellow-servant, surely the miners under him were fellow-servants, and it is so held in the rehearing of the case on page 469 [of 106 Mich., on page 335 of 64 N. W.]:

" 'That the failure of the miners or boss to notify the timbermen that the place was in readiness was the negligence of fellow-servants of the plaintiff.'

"I should have read a little further:

" 'We are satisfied with the proposition enunciated—that the failure of the miners or boss to notify the timbermen that the place was in readiness was the negligence of fellow-servants of the plaintiff.'

"Now, right to the very last the court says:

" 'The following cases confirm us in our opinion that, as an incident or means of excavating the ore, the master has only the duty of furnishing competent men, and furnishing suitable materials for the use of those engaged in the common employment.'

"Now it very plainly appears that the miners were the ones—in the opinion the miners were the ones to notify these timbermen when it was time to put in another set of timbers. The miners were negligent and failed to notify the timbermen after there was room. The court expressly says that the miners, in looking after the safety of the trammers in that respect, were fellow-servants.

"Now it has been argued a good deal that this *Petaja Case* has been modified by other decisions, Hosking against the Cleveland Cliffs, and Danula against the Quincy, and Scendar against the Winona, but in all of those cases distinctions are drawn and there isn't a word that it was the intention of the Supreme Court to modify this *Petaja Case* and this *Petaja Case* had been a leading case known to the mining district a number of years. If the Supreme Court intended to modify it, it would have said so, after citing it as the law of Michigan for so many years. I feel very sure there was no intention to modify the law as laid down in that case and in all the cases which were claimed to be under the *Petaja Case* by which they found there was a question of fact to submit to the jury in the cases I have men-

tioned and some others. The Supreme Court saw a distinction between those cases and the *Petaja Case,* and it was the distinction which permitted the case to go to the jury.

"We have here in this case, the decedent was a trammer. In carrying on this regular work, the miners were mining and he was tramming by loading the rock into the car. He saw, with his fellow workmen, a place that he thought looked dangerous, a large rock which he thought might fall and he went—he didn't go to the shift boss as in the *Petaja Case,* but went to the miners and complained to them, and the miners gave them assurance of safety, said the rock wouldn't fall. It seems to me if ever two cases were exactly alike in principle, it's this case and the *Petaja Case,* and believing as I do that the *Petaja Case* is the law in Michigan now as much as it ever was, I believe it is the duty of the court to direct a verdict in favor of this defendant. I believe this case also comes within the case of *Livingstone* v. *Plate Glass Co.* [146 Mich. 236, 109 N. W. 431], but I feel very sure it is covered in its entirety by the *Petaja Case.* The cases are very similar all the way through, and I do not see any distinguishing features at all, and therefore, gentlemen of the jury, the court will assume the burden of deciding this case and will decide it upon the law as laid down by the Supreme Court of Michigan.

"The court has decided that there is no question of fact to submit to you, but that the defendant cannot be held liable under the law of this State, and you will therefore return a verdict in favor of the defendant under the law as directed by the court."

Error is also assigned that the verdict and judgment are contrary to and not supported by the evidence, and are contrary to the law. There is, as stated by appellant, but one main question involved, viz.: Did the court err in directing a verdict for the reasons stated in the charge?

It is claimed by appellant that neither the boss nor the miners were intestate's fellow-servants under the evidence in the case. It is urged that under the evi-

dence the defendant undertook to protect the trammers against injury from any large rock (too large for the trammers to load in their cars) becoming lodged on the foot wall and afterwards rolling down the stope. While there are some expressions in the testimony that might, upon a casual reading, justify this claim, an examination of the entire testimony of each witness will disclose that no such claim is justified by the evidence. The most that can be said of the duty of the miners, with reference to the large rocks, is that they were to blast such rocks when requested to do so by the trammers. Such request had been made, and the miners had said they would attend to that duty in 15 minutes. The rock was then where it had been for four days. Before the 15 minutes had elapsed, the rock, by some unknown cause, rolled down and did the injury complained of. Under the evidence the blasting of these large rocks was done by the miners for the safety of the trammers, because the latter were not possessed of sufficient ability or training to use explosives.

Counsel for appellant seek to distinguish the case from the *Petaja* and *Livingstone Cases* cited by the trial judge in the charge, and urge that the case is ruled by *Scendar* v. *Copper Co.*, 169 Mich. 665 (135 N. W. 951), and kindred cases.

In the *Scendar Case* loose rock fell from the overhanging wall, and Justice BIRD said:

"The difference between the *Petaja Case* and the one under consideration lies in the proofs which tend to show that, as regards loose overhanging rock, the defendant relieved the trammers of the necessity of looking out for themselves and took upon itself the duty of making the place safe for them."

We find no such evidence in the instant case, which we think is readily distinguished.

Counsel also cite: *Minkkinen* v. *Mining Co.*, 169 Mich. 279 (135 N. W. 449). This was also a case of

rock falling from a hanging wall, and under the evidence differs from the instant case, as does also *Danula* v. *Mining Co.*, 166 Mich. 350 (130 N. W. 604).

After again examining the authorities cited by counsel upon both sides, we are of the opinion that the trial court was justified in directing a verdict for the defendant for the reasons stated. The danger of working below this large rock was apparent, and readily comprehended by the trammers. As Kosovac testified:

"But nobody could see any more than I saw, who went up and looked at it. Miners couldn't see any more than I could see."

Being told by the miners that they would blast at midnight, the trammers continued their work, and the rock fell in 5 minutes after the conversation. The neglect of the miners, if it can be called neglect, not to blast instantly, when requested by the trammers to do so, cannot be charged to the defendant, nor can it be said to have been the proximate cause of the injury. Manifestly, the miners were the fellow-servants of the trammers.

In our opinion the case is ruled by the following cases in this court: *Petaja* v. *Mining Co.*, 106 Mich. 463 (64 N. W. 335, 66 N. W. 951, 32 L. R. A. 435, 58 Am. St. Rep. 505); *Livingstone* v. *Plate Glass Co.*, 146 Mich. 236 (109 N. W. 431); *Amoe* v. *Engineering Works*, 151 Mich. 212 (114 N. W. 1010); *Ritzema* v. *Brick Co.*, 152 Mich. 75 (115 N. W. 705); *Bauer* v. *Car & Foundry Co.*, 132 Mich. 537 (94 N. W. 9); *Kaaro* v. *Mining Co.*, 178 Mich. 661 (146 N. W. 149); *Koskell* v. *Mining Co.*, 182 Mich. 586 (148 N. W. 699); *Dunn* v. *Dredge & Dock Co.*, 161 Mich. 551 (126 N. W. 833); *Cribb* v. *Engineering Works*, 167 Mich. 328 (132 N. W. 1020).

Particular attention upon the subject of fellow-servant is called to the recent case of *Mesich* v. *Min-*

*ing Co.*, 184 Mich. 363 (151 N. W. 564). That any assurance by the miners of safe condition, or promise to blast, was not binding on defendant, see *Guest* v. *Illuminating Co.*, 150 Mich. 438 (114 N. W. 226); *Maxwell* v. *Cement & Lime Co.*, 157 Mich. 631 (122 N. W. 225).

In *Koskell* v. *Mining Co., supra,* the assurance from Johnson (one of the miners) that the place was safe, presented a stronger case for the plaintiff than do the facts in the instant case. Looking after the hanging wall, in that case, was something the trammers could not do. Looking after and handling the broken rocks in the stope, was the trammers' work in the instant case. Furthermore, the conditions of danger surrounding this rock were open and apparent to everyone, especially to the trammers.

The rule of law applicable to this class of cases is that a statement or assurance of safety is not deemed to be given in a representative capacity, unless the person giving it is a vice principal. It cannot, we think, be seriously urged that these miners were vice principals. Many more cases might be cited from this and other jurisdictions, but we deem it unnecessary.

We find no error in the charge of the trial court, and are of the opinion that it was warranted both by the evidence and the law.

The judgment of the circuit court is affirmed.

BROOKE, C. J., and MCALVAY, KUHN, BIRD, MOORE, and STEERE, JJ., concurred. OSTRANDER, J., did not sit.